# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

—

No. 24-7043

September Term, 2025

FILED ON: JULY 29, 2026

GERALD D. DA'VAGE,

      APPELLANT

v.

DISTRICT OF COLUMBIA HOUSING AUTHORITY, ET AL.,

      APPELLEES

—

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01318)

—

Before: HENDERSON, PILLARD and CHILDS, *Circuit Judges*

## J U D G M E N T

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and arguments of the parties. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the judgment of the district court be **AFFIRMED**.

\* \* \*

Gerald Da'Vage, proceeding *pro se*, filed a wrongful termination action against his former employer, the District of Columbia Housing Authority, and several of its officials (collectively, DCHA).[1] Da'Vage's complaint asserts a single claim under 42 U.S.C. § 1983, alleging that, in violation of the Fifth Amendment, he was denied procedural due process during an investigation into his suspected misuse of a DCHA-issued credit card **[J.A. 5–7, 19–20]**. In resolving the

---

[1] Da'Vage also sued the president of the union that represents DCHA employees, Miranda Gillis, but the district court granted Gillis's motion to dismiss for failure to state a claim. *See Da'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 240–42 (D.D.C. 2022).

1

parties' cross-motions for summary judgment, the district court assumed without deciding that Da'Vage was constructively terminated and thus had a property interest in his continued DCHA employment, an interest necessary to maintaining a Fifth Amendment due process claim. The district court nevertheless granted summary judgment to DCHA, concluding that Da'Vage had received constitutionally adequate process before his constructive termination. We conclude, however, that Da'Vage voluntarily resigned from his DCHA position and thus he no longer had a protected property interest in his government job. Accordingly, we affirm the district court's grant of summary judgment to DCHA on this alternative ground.

## I.[2]

Da'Vage worked as a DCHA housing inspector from December 2013 until December 2017. The terms of his employment were governed by the collective bargaining agreement between DCHA and the American Federation of Government Employees Local 2725 (Union). As a housing inspector, Da'Vage conducted site visits to District of Columbia Housing Choice Voucher Program (HCVP) units to "assure" that the units were "safe, decent, sanitary and in good repair." J.A. 155. To enable Da'Vage to conduct site visits, DCHA provided him access to a car and a credit card to purchase gas for the vehicle.

As a matter of policy, DCHA monitored and reviewed the usage of employee-issued credit cards. For instance, DCHA required Da'Vage to turn in the credit card at the end of each day. DCHA also required Da'Vage to submit receipts and track his purchases in an "activity log," detailing, among other things, the gas stations he had visited and how many gallons of gas he had purchased. In addition to these requirements, DCHA conducted monthly audits of a random selection of "10% of employees who have government credit cards, to ensure appropriate usage of the credit cards." J.A. 123.

During the November 2017 routine audit, DCHA found multiple discrepancies in Da'Vage's October 2017 credit card statement: charges totaling $532.87, though the "average monthly expenditure for other employees at that time was $154"; transactions for purchases in Maryland (where there were no HCPV housing units); and multiple transactions without corresponding receipts. J.A. 123. On November 6, Da'Vage's first-line supervisor emailed Da'Vage requesting that he return the DCHA-issued credit card and submit "all the receipts" since that card had been issued to him in June 2017. J.A. 125.[3] The next day, Da'Vage met with his first-and second-line supervisors about his October 2017 credit card usage. During this meeting, he denied any improper use of the credit card. Da'Vage then stopped responding to his supervisors' questions and requested a Union representative. On November 8, Da'Vage responded to an email from his supervisors "following up" about the "gas transactions without the gas receipts," stating: "all receipts have been turned in; to the very best of my knowledge." J.A. 161. Shortly thereafter, DCHA conducted another audit of Da'Vage's credit card, revealing

---

[2] These facts are derived from the summary judgment record; none are materially disputed. *See* Fed. R. Civ. P. 56(a).

[3] Unless otherwise noted, all dates are from the year 2017.

additional transactions from July 2017 through November 2017 that were missing receipts.

On November 29, Da'Vage's second-line supervisor submitted a memorandum to human resources recommending Da'Vage's termination based on the alleged credit card misuse. By December 7, DCHA's human resources manager "had received the evidence and prepared a draft Notice of Disciplinary Action for termination." J.A. 56.[4] The evidence in support of termination included an email to Da'Vage's supervisor summarizing the results of the DCHA audits, as well as the credit card statements reflecting the disputed transactions.

In the days after DCHA had prepared the draft Notice of Disciplinary Action, Da'Vage met with DCHA's Labor and Employee Relations Manager and a Union representative about the disputed transactions which would serve as the basis for his termination.[5] Following this meeting, the Union representative spoke with Union President Miranda Gillis to provide her an overview of the meeting and the general allegations against Da'Vage.

On December 19, Da'Vage spoke with Gillis who advised him that:

> [W]hat he did was very serious, and that, you know, it was theft. And if the agency, depending on the amount, if the agency so chose to do so, they could move further with any other kind of prosecution, you know, depending on the amount. I did not know what the amount was or how much he had used the credit card at that time. But it was, you know - - I thought it was important at that time that Mr. Da'Vage realize the seriousness of the action. Depending upon the amount at issue, DCHA could initiate criminal proceedings for theft.

J.A. 173 (alteration in original). Gillis further advised Da'Vage that:

> [U]nless you're no longer employed by the agency or you resign or quit, when they finish what they're doing, they're going to serve the termination. Only way you won't get it, [i]s if you're not here to get it. But, other than that, if they have the evidence, they're going to move forward.

J.A. 176. Gillis also encouraged Da'Vage "to wait until" he had "a piece of paper in hand" explaining "what [DCHA is] saying" about his misconduct to make any decisions. J.A. 175. Before this conversation, Da'Vage had been unaware that he could be criminally prosecuted for

---

[4] A Notice of Disciplinary Action informs a Union employee of the "proposed discipline with supporting evidence attached as exhibits" and advises the employee of his or her "rights to file a grievance." J.A. 55 (citation omitted).

[5] The parties dispute the exact date of this meeting. DCHA and the Union contend that it occurred on December 14; Da'Vage maintains that it occurred on December 19 and that a different meeting occurred on December 14 between him and his supervisors, during which he was informed that his unauthorized card usage was being referred to the DCHA human resources department. The precise date of the meeting, however, is immaterial to our resolution of this appeal.

misuse of the DCHA-issued credit card.

That same day, Gillis attempted, on Da'Vage's behalf, to negotiate with DCHA for a lesser penalty than termination. But the agency was "firm" in its decision to move forward with Da'Vage's termination. J.A. 236. DCHA informed Gillis that the recommendation of termination had been submitted and was just waiting on the necessary signatures, and that it intended to serve Da'Vage with the termination notice by December 22. Gillis, in turn, relayed this information to Da'Vage.

On December 21, Da'Vage's supervisor called Gillis because Da'Vage had not reported for work on December 20 or December 21. Gillis then called Da'Vage, who informed her that he had decided to resign. Though some details regarding this conversation are disputed, the parties agree that Gillis advised Da'Vage not to resign and reiterated that the Union would represent him in challenging DCHA's termination decision.[6] Despite this advice, Da'Vage reiterated his decision to resign, believing he would have no success in dissuading DCHA from moving forward with his termination. Da'Vage then requested assistance in drafting a resignation letter, which the Union provided. Da'Vage submitted his resignation letter and returned his equipment to DCHA that same day. Da'Vage was on paid administrative leave and maintained his health insurance until January 18, 2018.

In May 2021, Da'Vage filed this lawsuit in the U.S. District Court for the District of Columbia against DCHA under 42 U.S.C. § 1983, alleging that they had violated his Fifth Amendment rights by depriving him of his property interest in his job without procedural due process. At the close of discovery, the parties filed cross-motions for summary judgment. The district court denied Da'Vage's motion and granted DCHA's. *Da'Vage v. D.C. Hous. Auth.*, Civ. A. No. 21-1318, 2024 WL 1366786, at *1 (D.D.C. Mar. 31, 2024). Da'Vage timely appealed. In view of Da'Vage's *pro se* status, we appointed amicus to argue against the decision below. Amicus has ably discharged their duties.

**II.**

We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment *de novo*." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). "We may affirm the grant of summary judgment on any ground supported by the record, even if it differs from the theory applied by the district court, 'provided that the opposing party has had a fair opportunity to dispute the facts material to that ground.'" *Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014) (quoting *Washburn v. Lavoie*, 437 F.3d 84, 89 (D.C. Cir. 2006)).

DCHA is entitled to summary judgment only upon showing "that there is no genuine dispute as to any material fact and [DCHA] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In undertaking our review, we "must avoid weighing the evidence and making

_____

[6] According to Da'Vage, Gillis told him: "If you do not go to the office today and turn in your resignation letter, HR will start to charge you your earned leave and may even withdraw [your] resignation offer and initiate a criminal investigation." J.A. 178. In support of this factual assertion, Da'Vage cites to Gillis' deposition, but that testimony makes no mention of any such comments.

credibility determinations. We instead assume all conflicts would be resolved and all inferences drawn in [Da'Vage]'s favor and inquire whether, on the evidence so viewed, 'a reasonable jury could return a verdict for'" Da'Vage. *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Yet "[t]he existence of genuine issues . . . may not be shown by mere allegations or denials in the adverse party's pleadings." *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Inc. v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 781 F.2d 928, 933 (D.C. Cir. 1986). Rather, as "[t]he party opposing summary judgment," Da'Vage must rely on "specific facts." *Id.*

**III.**

The Fifth Amendment guarantees that the government cannot deprive citizens of any property "without due process of law." U.S. Const. amend. V. Property in this context, as the parties agree, includes Da'Vage's interest in his continued employment at DCHA. *See Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (explaining that a property interest exists for due process purposes where an employee has assurances of continued employment and "can 'be removed only for cause'" (citation omitted)). The thrust of Da'Vage's Fifth Amendment claim is that he was entitled to more extensive procedures during the investigation into his alleged misuse of his DCHA-issued credit card.

To prevail on his Fifth Amendment claim, Da'Vage must show that he did not voluntarily resign from his position as a housing inspector at DCHA. The voluntary nature of Da'Vage's resignation is critical to his due process claim because when an employee voluntarily resigns, the question of what process was due becomes irrelevant. *See Lawrence v. Acree*, 665 F.2d 1319, 1326 (D.C. Cir. 1981) (concluding plaintiff gave up any "constitutionally protected interest" when he voluntarily left his government service position); *Keyes v. District of Columbia*, 372 F.3d 434, 438 (D.C. Cir. 2004) (declining to reach the "substance" of plaintiff's due process claim because she left her job voluntarily).

The district court assumed without deciding that Da'Vage's resignation was involuntary *i.e.*, that he was "effectively terminated on December 21"— and held that regardless, "the undisputed evidence is such that no reasonable factfinder could find that Da'Vage was denied constitutionally adequate process before" the effective termination. *Da'Vage*, 2024 WL 1366786, at *7 (citation modified). On appeal, the parties have, with varying degrees of emphasis, addressed the issue of whether Da'Vage's resignation was voluntary. Because it is an antecedent issue that is dispositive of Da'Vage's due process claim, we begin our analysis with the threshold question of whether Da'Vage voluntarily resigned from DCHA. *See Monahan v. Romney*, 625 F.3d 42, 47 (1st Cir. 2010) ("[Where an employee] voluntarily resign[s], his claim that the defendants deprived him of a property interest within the meaning of the Due Process Clause necessarily fails.").

We begin with the presumption that Da'Vage resigned voluntarily. *See Keyes*, 372 F.3d at 439 ("[A] [resignation] request initiated by an employee is presumed to be a voluntary act." (citation omitted)). Da'Vage can overcome this presumption by showing "a reasonable person in

[his] position would have felt compelled to resign under the circumstances." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). A resignation may be involuntary where it was procured by the employer's duress or where it was obtained by the employer's misrepresentation. *See*, *Keyes*, 372 F.3d at 438–39; *see also Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988) (explaining a resignation may be involuntary where (1) "[it was] obtained by the employer's misrepresentation or deception" or (2) "[it was] forced by the employer's duress or coercion" (collecting cases)).

On this record, drawing all inferences in Da'Vage's favor, we conclude that no reasonable jury could find either that Da'Vage's resignation was procured through DCHA's duress or that it was obtained by DCHA's misrepresentation.

**A.**

To establish involuntary resignation based on duress, Da'Vage must show that: (1) DCHA "impose[d] the terms of an employee's resignation," (2) Da'Vage's "circumstances permit[ted] no alternative but to accept," and (3) "those circumstances were the result of improper acts of the agency." *Keyes*, 372 F.3d at 439 (quoting *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)). Da'Vage asserts that he resigned under duress because he was concerned that DCHA would put him on unpaid leave pending a criminal investigation and "fear[ed] that termination could cause him 'economic loss.'" Amicus Reply Br. 15 (quoting *Wilson v. Shultz*, 475 F.2d 997, 999–1000 (D.C. Cir. 1973)).

Da'Vage's argument runs headlong into our pronouncement in *Keyes* that "where an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act." 372 F.3d at 439 (quoting *Schultz*, 810 F.2d at 1136). Da'Vage "could have waited for [DCHA] to take some administrative action such as . . . initiating disciplinary action," and "then challenge[] [DCHA's] action through appropriate administrative channels." *Latham v. U.S. Postal Serv.*, 909 F.2d 500, 503 (Fed. Cir. 1990) (concluding resignation was voluntary given that the employee had the alternative option to stay and challenge the charges). The Union even encouraged Da'Vage not to resign and reminded him that the Union would aid him in challenging DCHA's termination decision. J.A. 265–67. Despite this advice, Da'Vage reiterated his intent to resign, and decided to submit his resignation letter that same day. These facts undercut Da'Vage's theory that he had "no alternative" but to resign. *See, e.g.*, *Keyes*, 372 F.3d at 439–40 (determining that an employee failed to establish she resigned under duress where she faced the choice between remaining an employee and continuing to fight the charges or retiring early); *Veitch v. England*, 471 F.3d 124, 128–29 (D.C. Cir. 2006) (noting that appealing an investigation is a "reasonable alternative to resignation"). "Although choosing between these options may have been difficult, it was a voluntary decision nonetheless." *Keyes*, 372 F.3d at 440.

We are unpersuaded otherwise by Da'Vage's assertion that his resignation was involuntary because, in his view, he was forced to make a decision under improper "time pressure." Appellant's Reply Br. 13. True, we have held that the voluntariness of an employee's resignation is called into question where the employee is confronted with allegations of misconduct and

"pressed" "then and there" to make "an immediate decision" whether to resign and is deprived of the opportunity to "think the matter over," seek "advice of counsel," or "discuss the matter with [his] wife or friends." *Paroczay v. Hodges*, 297 F.2d 439, 441 (D.C. Cir. 1961). But Da'Vage's situation is materially distinguishable from such circumstances. Da'Vage was first made aware that DCHA suspected him of misconduct on November 7 during a meeting with supervisors—over a month before he resigned. Da'Vage surely had the time to think the matter over, seek advice of counsel, and discuss the matter with his family or friends. *Cf. id.* Indeed, the record shows that Da'Vage took advantage of that time by seeking advice from his Union representatives on multiple occasions. At bottom, the weeks between when DCHA first confronted Da'Vage about his suspected credit card misuse and when he submitted his resignation do not create the kind of time pressure amounting to duress. *See Latham*, 909 F.2d at 503 (concluding that where two weeks had passed between the initial interrogation of the employer about his suspected misconduct and the resignation, there was insufficient temporal proximity to conclude that the agency had induced the employee's resignation). Even if, as Da'Vage urges, we were to arbitrarily narrow the timeline to the three days between the Union first mentioning Da'Vage's option to resign and his resignation, it still does not create the type of improper time-pressure that would rise to the level of duress. Da'Vage has never disputed that DCHA had a good-faith basis for its concerns, and the agency reasonably moved quickly to remove an employee whom it believed to have committed serious misconduct. *See, e.g.*, *Rich v. Mitchell*, 273 F.2d 78, 79 (D.C. Cir. 1959) (per curiam) (concluding that employer "did not act illegally or improperly" when it stated in good faith that "unless [the employee] resigned within three days, the Department would bring certain charges against him proposing his dismissal, and these charges might lead to fine or imprisonment"); *cf. D.C. Metro. Police Dep't v. Stanley*, 942 A.2d 1172, 1174, 1177–78 (D.C. 2008) (ruling employer procured resignation through duress where employee was forced to decide "within the hour" whether to retire or accept a demotion).

For these reasons, we conclude that DCHA did not procure Da'Vage's resignation through duress.

**B.**

Alternatively, Da'Vage asserts that DCHA obtained his resignation by misrepresentation. "A resignation may be deemed involuntary if induced by the employee's reasonable reliance on [their] employer's misrepresentation of a *material* fact concerning the resignation." *Keyes*, 372 F.3d at 440 (emphasis added) (quoting *Stone*, 855 F.2d at 174). Da'Vage asserts that DCHA misrepresented the time frame and the finality of the decision to terminate him—specifically, that DCHA misrepresented that it would serve him with the notice of termination on Friday, December 22. Even taking as true Da'Vage's assertion that DCHA misrepresented the date of intended service and the status of the investigation, we cannot say that such a misrepresentation was "material" to Da'Vage's resignation decision. *Keyes*, 372 F.3d at 440. Da'Vage stated that he resigned to avoid using unpaid leave, to pretermit a possible criminal investigation, and based on his belief that he would be unsuccessful in challenging DCHA's termination decision. On appeal, Da'Vage contends that a closure at DCHA prevented him from speaking with an official there prior to December 22, and that he would have sought more information about the charges against him if he knew he had more time before being served with the termination notice. Yet he has

never explained how this additional information would have altered the calculus of his decision. Similarly, though amicus contends that DCHA's time frame prevented Da'Vage from seeking accurate information about the "benefits and consequences of resignation as opposed to termination," Amicus Reply Br. 15, amicus points to no evidence that such additional information would have affected Da'Vage's decision to resign.

We thus conclude that DCHA did not procure Da'Vage's resignation through a material misrepresentation.

## IV.

For these reasons, we affirm the district court's order granting summary judgment in favor of DCHA on the alternative ground that Da'Vage voluntarily resigned and thus relinquished any constitutionally protected interest in his continued government employment.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after the resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a).

## **Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/
Daniel J. Reidy
Deputy Clerk

8